# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

---

| | | |
|---|---|---|
| JOHN MATTHEW CHANCEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | No. 22 CV 04043 |
| | ) | |
| v. | ) | Hon. John J. Tharp, Jr. |
| | ) | |
| THE ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANT RAOUL'S COMBINED MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

August 26, 2022

Erin Walsh
Marci L. Sahinoglu
Assistant Attorneys General
100 W. Randolph Street, 13th Floor
Chicago, Illinois 60601
erin.walsh@ilag.gov
marci.sahinoglu@ilag.gov

*Counsel for Defendants*[1]

KWAME RAOUL
Attorney General of Illinois

---

[1] The Board of Elections defendants take no position in this lawsuit other than the Plaintiffs' claims against the Board are barred by the Eleventh Amendment.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ........................................................................................................................ 3

    I.    Plaintiffs Fail to State a Plausible Claim under the First Amendment. ........................ 3

        A.    The prohibition on out-of-state contributions to judicial candidates is closely drawn to protect the State's interest in preserving the appearance of a fair and disinterested judiciary. ....................................................................................... 4

            1.    Judicial elections are subject to special considerations that do not apply to legislative or executive elections. ............................................................... 6

            2.    Plaintiff's reliance on Supreme Court precedent focusing on *quid pro quo* corruption in legislative and executive elections fails to account for the greater government interest in preventing the appearance of corruption in judicial races. ............................................................................................. 8

            3.    The purported out-of-state "ban" is not a ban, but an appropriately tailored regulation aimed at preventing corruption or the appearance thereof in judicial elections and preserving public perception of judicial integrity. . 10

        B.    The $500,000 contribution limit to independent expenditure committees prevents the appearance of a judiciary subject to the whims of large, less transparent donors. ......................................................................................... 12

        C.    The Eleventh Amendment bars Plaintiffs' claims against the State Board of Elections. ............................................................................................................ 16

    II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied. .......................... 16

        A.    Plaintiffs are unlikely to succeed on the merits of their claims. ........................ 18

        B.    Plaintiffs have not demonstrated irreparable harm. .......................................... 18

        C.    If the Court reaches the "balancing" phase, it should deny preliminary relief while the case proceeds. ................................................................................... 19

CONCLUSION .................................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.3d 6(7th Cir. 1992) ................................................. 17

*Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224 (7th Cir. 1993) .................................. 7, 8

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................................ 5, 10

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .................................................... 13

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ....................................... 16, 17, 19, 22

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ............................................. 8, 13

*Common Cause Indiana v. Individual Members of the Indiana Election Comm'n*, 800 F.3d 913 (7th Cir. 2015) ....................................................................................................... 9

*Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639 (7th Cir. 2020) .............................. 1, 20

*FEC v. Beaumont*, 539 U.S. 146 (2003) ............................................................................ 6

*Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158 (N.D. Ill. May 29, 2002 ............................... 19

*French v. Jones*, 876 F.3d 1228, 1237 (9th Cir. 2017 ...................................................... 4

*French v. Jones*, 876 F.3d at 1241 ................................................................................ 14

*Gacho v. Wills*, 986 F.3d 1067 (7th Cir. 2021) ................................................................ 11

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079 (7th Cir. 2008) ......................................................................................................... 17

*Hispanic Leadership Fund, Inc. v. Walsh*, No. 1:12-cv-1337, 2012 U.S. Dist. LEXIS 189367 (N.D.N.Y. Oct. 23, 2012) .......................................................................................... 21

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ............................................................. 4

*Ill. Liberty PAC v. Madigan*, 904 F.3d 463 (7th Cir. 2018) ................................................. 12

*Ill. Republican Party v. Pritzker*, 937 F.3d 760 (7th Cir. 2020) .................................. 1, 18, 19

*Jones v. Jegley*, 947 F.3d 1100, 1106 (8th Cir. 2020) ........................................................ 4

*Joseph v. Bd. of Regents of Univ. of Wisconsin Sys.*, 432 F.3d 746 (7th Cir. 2005) .................... 16

*Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904 (7th Cir. 1991) ...................................... 16

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................... 16

*McCutcheon v. FEC*, 572 U.S. 185 (2014) .................................................................... 7, 8

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ............................................................... passim

*O'Toole v. O'Connor*, 802 F.3d 783 (6th Cir. 2015) ......................................................... 12

*Proft v. Raoul*, 944 F.3d 686 (7th Cir. 2019) ............................................................. 15, 19

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ........................................................................... 20

*Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949 (N.D. Ill. 2018)...... 19

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020)......................... 20

*Republican Party v. White*, 536 U.S. 765 (2002).................................................... 7, 8, 12

*The Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255 (1st Dist. 1991) ...................... 11

*Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) .......................................................... 11

*Valencia v. City of Springfield*, 883 F.3d 959 (7th Cir. 2018) ................................................ 2

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ................................................................. 5, 6

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).................................................. 16

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) .............................................. 4, 12, 13, 15

*Winter v. NRDC, Inc.* 555 U.S. 7 (2008) ......................................................... 1, 16, 18

*Winter v. Wolnitzek*, 834 F.3d 681 (6th Cir. 2016) ............................................................. 3

*Wis. Right to Life State PAC v. Barland*, 664 F.3d 139 (7th Cir. 2011) ............................... 5, 13

*Wolfson v. Concannon*, 811 F.3d 1176 (9th Cir. 2016) ....................................................... 4

## Statutes

10 ILCS 5 ............................................................................................... 5, 8, 11
10 ILCS 5/9-8.5(b-5)(1)(B) .................................................................... 5, 6, 12
10 ILCS 5/9-8.5(b-5)(1.2) ..................................................................... 6, 15, 23
10 ILCS 5/9-8.6(a) ....................................................................................... 19
705 ILCS 40 ................................................................................................... 8
705 ILCS 45 ................................................................................................... 8
705 ILCS 50 ................................................................................................... 8

## Other Authorities

Alison Frankel, "Behind $250 million State Farm settlement, a wild tale of dark money in judicial elections," Reuters (September 5, 2018) .................................................................... 17

Debra Cassens Weiss, "State Farm to pay 250M to settle suit claiming it orchestrated win of justice who voted its way," ABA Journal (September 10, 2018) ............................ 17

Illinois Judges Project, *Illinois Judges Report* (Northwestern Univ. 2015). ................................. 9

Jim Suhr, "Appeal Questions Justice, Fairness," *Springfield Journal-Register* (September 15, 2011) ................................................................................................................. 17

Joanna Shepherd, *Justice at Risk: An Empirical Analysis of Campaign Contributions and Judicial Decisions* (American Constitution Society June 2013) ......................................... 9, 18

Lawrence Lessig, *The Brennan Center Jorde Symposium on Constitutional Law: What an Originalist Would Understand "Corruption" to Mean*, 102 Calif. L. Rev. 1 (Feb. 2014) ....... 11

Michael J. Bologna, "State Farm Settlement Lets Dark Money Remain in Shadows," Bloomberg Law (September 13, 2018) ......................................................................................... 18

## Treatises

*Federal Practice & Procedure* (3d ed.) ....................................................................... 23

## Constitutional Provisions

Illinois Const. Art. VI, §10 ............................................................................................. 9
Illinois Const., Art. VI ................................................................................................... 8
Illinois Const., Art. VI, §12 ........................................................................................... 9

# INTRODUCTION

Two months before the 2022 election, and after candidates and donors have abided by the present rules without incident for the entire election cycle, Plaintiffs seek the "extraordinary remedy," *Winter v. NRDC, Inc.* 555 U.S. 7, 24 (2008), of a preliminary injunction pending resolution of their First Amendment claims against two aspects of Illinois' statutory regime governing the financing of state judicial elections.

Plaintiffs' highly disruptive request should be denied. Plaintiffs cannot show they are "likely to succeed on the merits," *Ill. Republican Party v. Pritzker*, 937 F.3d 760, 762 (7th Cir. 2020); indeed, their claims should be dismissed. They rely almost exclusively on federal precedent governing legislative and executive-branch elections. But the judiciary plays a unique role in our constitutional system of government: unlike the political branches, which exist to represent the will of their constituents, the judiciary is meant to be insulated from those very pressures. Plaintiffs' arguments thus carry little weight here. Given the singular role of the judiciary, removing protections against even public perception of a biased or malleable judiciary can have grave consequences. Laws regulating out-of-state contributions to judicial candidates and capping contributions to independent expenditure committees established to support or oppose judicial candidates at $500,000 serve the State's important interest in ensuring the integrity of its judicial officers. Plaintiffs' First Amendment claims therefore fail as a matter of law.

If the Court does not dismiss Plaintiffs' claims, it should nonetheless deny their request for extraordinary—and extraordinarily disruptive—relief a mere two months before the 2022 election. The U.S. Supreme Court has admonished federal courts not to "change electoral rules close to an election date." *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020) (per curiam); *see also, e.g., Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J.,

concurring) ("When an election is close at hand, the rules of the road must be clear and settled.").

Plaintiffs' request for emergency relief two months before the 2022 election contravenes that basic principle. Plaintiffs want the Court to "swoop in and re-do" Illinois's campaign finance laws governing state judicial elections, *id.* at 881, after having waited months—and in Plaintiff Chancey's case, the better part of a year—to assert their First Amendment rights. The Court should decline that disruptive request.

A substantial modification to the State's campaign finance laws of the kind Plaintiffs seek at this late hour would cause confusion and chaos in the State's electoral process and upset the expectations of all individuals, political parties, and political organizations involved in the upcoming election. If Plaintiffs' claims are not dismissed, the question for the Court is how to balance the equities while the case proceeds. *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018). Plaintiffs have failed to show they are entitled to the "far-reaching" remedy of a preliminary injunction, *id.*, given the serious costs that such a remedy would impose on the State and the public.

Plaintiffs' First Amendment claims should be dismissed and their motion for preliminary injunction denied.

## BACKGROUND

On November 15, 2021, the Illinois Election Code was amended to prohibit "a candidate political committee established to support a candidate seeking nomination to the Supreme Court, Appellate Court, or Circuit Court" from accepting any out-of-state contributions. 10 ILCS 5/9-8.5(b-5)(1)(B). Approximately six months later, the Illinois Election Code provision pertaining to independent expenditure committees established to support or oppose a candidate seeking judicial office was amended to set a $500,000 contribution limit from any single person in an election

cycle. 10 ILCS 5/9-8.5(b-5)(1.2). Any contribution received over the $500,000 limit must be immediately forwarded to the Illinois State Treasurer to be deposited in the State Treasury. *Id*.

Plaintiff John Matthew Chancey is a former Illinois resident who seeks to donate money to multiple candidates running for judicial office in Illinois, but is unable to do so under Section 9-8.5(b-5)(1)(B) of the Illinois Election Code. Dkt. 1 ¶¶ 33-34. Plaintiff Fair Courts America is an independent expenditure committee that seeks to make independent expenditures in support of or in opposition to certain Illinois judicial candidates; Fair Courts America seeks to receive contributions from donors in excess of $500,000. *Id*. at ¶ 35. Plaintiff Restoration PAC, an independent expenditure committee, would like to make contributions in an amount in excess of $500,000 to Fair Courts America for the purpose of supporting or opposing Illinois judicial candidates, but is unable to do so currently under Section 9-8.5(b-5)(1.2). Dkt.1, ¶ 39.

## ARGUMENT

### I. Plaintiffs Fail to State a Plausible Claim under the First Amendment.

In light of the special concerns presented by judicial elections, the Illinois General Assembly has taken steps to ensure the integrity of these vital elections. In an arena where traditional First Amendment jurisprudence has limited weight, campaign finance restrictions governing the election of judicial officers is permissible and necessary, even where restrictions on elections of the legislative and executive branches may not be allowed.

Judicial elections occupy their own corner of the First Amendment square. As recognized by the Sixth Circuit, "treating elections for the courts just like elections for the political branches does not make sense." *Winter v. Wolnitzek*, 834 F.3d 681, 695 (6th Cir. 2016). As the Supreme Court has observed, the "precedents applying the First Amendment to political elections have little bearing on issues" pertaining to the regulation of speech and conduct within the scope of judicial elections. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 477 (2015). This is because of the critical role

played by the judiciary within the American system of government. Thus, the Supreme Court has confirmed that the State has a "compelling interest in preserving public confidence in the integrity of the judiciary. *Id.* at 444.

Other courts have similarly confirmed that society has an undeniable interest in "maintaining both the appearance and the reality of a *structurally independent* judiciary, engaged in a decisionmaking process informed by legal, not political or broad, nonlegal policy considerations." *Wolfson v. Concannon*, 811 F.3d 1176, 1187 (9th Cir. 2016) (Berzon, J., concurring); *French v. Jones*, 876 F.3d 1228, 1237 (9th Cir. 2017); *see also Hodge v. Talkin*, 799 F.3d 1145, 1150 (D.C. Cir. 2015) (noting longstanding interest in "assuring the appearance (and actuality) of a judiciary uninfluenced by public opinion and pressure"). As opposed to elections for legislative or executive offices, "different rules apply to judicial elections." *Jones v. Jegley*, 947 F.3d 1100, 1106 (8th Cir. 2020). Where judicial elections are involved, the State has an interest beyond the mere prevention of *quid pro quo* corruption or its appearance, and maintains a very real interest in maintaining the impartiality of its judiciary.

Given these interests unique to judicial elections, the State's prohibition on out-of-state contributions to judicial candidates satisfies the applicable intermediate scrutiny standard. And, in light of the State's compelling interest in ensuring the integrity of its judiciary, the contribution limits placed on donations to independent expenditure committees is permissible even under the more discerning strict scrutiny standard.

A.    **The prohibition on out-of-state contributions to judicial candidates is closely drawn to protect the State's interest in preserving the appearance of a fair and disinterested judiciary.**

Supreme Court precedent consistently distinguishes limitations on contributions from restrictions on expenditures within a campaign finance context. Since the Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), courts have utilized a form of intermediate scrutiny to

determine the constitutionality of campaign contributions following the reasoning in *Buckley* that "limits on contributions to a candidate's campaign do not burden speech and political-association rights to the same degree as limits on political expenditures." *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011).

Plaintiffs cite *Citizens United* and assert that: "However, laws that restrict a certain class of people *from making political contributions* are 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" Dkt, 1 at 23 and Dkt. 6 at 2 (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (emphasis added)). But *Citizens United* does not hold that. *Citizens United* addressed a ban on corporate political spending in the form of *independent expenditures* – not direct campaign contributions. *Id.* It is well settled that the standard for evaluating limits on independent campaign expenditures is stricter than the standard for individual contributions. *See, e.g.*, *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011). Further, the law prohibiting expenditures discussed in *Citizens United* was in the context of a presidential election, not a judicial election. 558 U.S. at 319-320. *Citizens United* and its progeny must be considered for their actual holding, and not for how Plaintiffs would like to characterize them.

Accordingly, restrictions on campaign contributions are constitutionally permissible so long as they are "closely drawn" to the furtherance of an important governmental interest. *Id.* The means employed in furtherance of this goal must "avoid unnecessary abridgment of associational freedoms." *Wagner v. FEC*, 793 F.3d 1, 5 (D.C. Cir. 2015). Courts have applied the intermediate scrutiny standard even where contributions are completely prohibited. *See id.* at 6 (citing *FEC v. Beaumont*, 539 U.S. 146, 161-63 (2003)). The level of scrutiny depends upon the type of activity at issue—not the severity of the restriction. *Id.*

## 1. Judicial elections are subject to special considerations that do not apply to legislative or executive elections.

Illinois has chosen a state judiciary system in which the bulk of judges are elected, rather than appointed. *See* Illinois Const., Art. VI; Judicial Vacancies Act, 705 ILCS 40; Associate Judges Act, 705 ILCS 45; Cook County Circuit Apportionment Act of 1991, 705 ILCS 50; 10 ILCS 5, Articles 7 and 7A-1. As of 2015, there were over a thousand judges at the Supreme, Appellate, and Circuit court levels in Illinois,[2] each of whom must either be elected to judicial office or be appointed initially, and then required to garner 60 percent of the vote in order to retain their judicial seat. Illinois Const., Art. VI, §12*, see also* Illinois Judges Project, *Illinois Judges Report* at 6 (Northwestern Univ. 2015).[3] Judges serve either ten-, four-, or six- year terms. Illinois Const. Art. VI, §10. State Court judges decide over 90 percent of the country's legal business. *See* Joanna Shepherd, *Justice at Risk: An Empirical Analysis of Campaign Contributions and Judicial Decisions,* at 1-2 (American Constitution Society June 2013).[4] In other words, the elected judiciary in Illinois is responsible for the rulings that effect our daily lives. It is paramount, therefore, that Illinois' elected judiciary remains independent, unswayed by corruption, or even the appearance of corruption.

---

[2]The number of circuit court judges in a particular district is based on population. 705 ILCS 35/2 and 2a.

[3] *Available at* http://illinoisjudges.law.northwestern.edu/files/IllinoisJudges.pdf (last visited Aug**.** 24, 2022). This Court may take judicial notice of this information and other external sources cited in this brief, as they are public records "not subject to reasonable dispute." *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012); *see* Fed. R. Evid. 201 (b)(2) (permitting judicial notice of facts "whose accuracy cannot reasonably be questioned"); *see also* Fed. R. Evid. 902(6) (official documents and newspapers are self-authenticating); Fed. R. Evid. 101 (b)(6) (rules on printed information apply to electronic sources of information).

[4] *Available at* https://www.acslaw.org/wp-content/uploads/old-uploads/originals/documents/JusticeAtRisk_Nov2013.pdf, (last visited Aug. 24, 2022).

The Illinois Code of Judicial Conduct reflects these values. The Code of Judicial Conduct contains four canons, all of which emphasize avoiding both impropriety and the appearance of impropriety:

> Canon 1 - A Judge Shall Uphold And Promote The Independence, Integrity, And Impartiality Of The Judiciary And Shall Avoid Impropriety And The Appearance Of Impropriety In All Of The Judge's Activities.

> Canon 2 - A Judge Shall Perform The Duties Of Judicial Office Impartially, Competently, And Diligently.

> Canon 3 - A Judge Shall Conduct The Judge's Personal And Extrajudicial Activities To Minimize The Risk Of Conflict With The Obligations Of Judicial Office.

> Canon 4 - A Judge Or Judicial Candidate Shall Not Engage In Political Or Campaign Activity That Is Inconsistent With The Independence, Integrity, Or Impartiality Of The Judiciary.

Illinois Supreme Court Rules, Article XI. Illinois Code of Judicial Conduct of 2023.

The Supreme Court has discussed the tension between government's legitimate interest in curbing corrupting influences in the political process, and impermissible incursions on First Amendment speech in various cases going back nearly fifty years. *McCutcheon* v. FEC, 572 U.S. 185, 192 (2014). Those cases, however, all involved discussions of the political reality in contests for legislative and executive office, not judicial races. "Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength of the state's interest in restricting their freedom of speech." *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224, 228 (7th Cir. 1993).

 Similarly, the courts have applied different rules when the issue was the First Amendment free speech rights of the judicial candidate. *See, e.g.*, *Republican Party v. White*, 536 U.S. 765 (2002); *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d at 228. In those cases, the First Amendment right at issue was *the judicial candidate's* own speech. For instance, in *Buckley v. Illinois Judicial Inquiry Board,* the Seventh Circuit discussed an Illinois Supreme Court Rule

regulating the speech of Illinois judicial candidates. *Id.* at 225. In *Republican Party v. White*, the Supreme Court examined a similar provision in Minnesota's code of judicial conduct. 536 U.S. at 768. Both courts found that the state judicial canon's restrictions on judicial candidate's speech violated the judicial candidate's First Amendment rights. This case is markedly different. The speech at issue is not a judicial candidate's speech, but that of a non-resident, prospective political donor.

The only caselaw discussing the unique considerations at issue in judicial elections are ones that implicate the direct speech of judicial candidates. Applying reasoning or holdings from those cases to the speech of non-resident political donors in judicial elections does not advance the First Amendment analysis in this case.

> **2. Plaintiff's reliance on Supreme Court precedent focusing on *quid pro quo* corruption in legislative and executive elections fails to account for the greater government interest in preventing the appearance of corruption in judicial races.**

While it is undisputed that maintaining the integrity of the judiciary through the prevention of corruption are key objectives for the State in regulating the judiciary, and for the judiciary by regulating itself, it is less clear how "corruption" should be defined in judicial elections as compared to corruption in legislative and executive office elections. In *McCutcheon v. FEC*, the Supreme Court acknowledged that "access" and "ingratiation" is not corruption in most elections, because they "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." 572 U.S. 185, 192 (2014) (citing *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 360 (2010)). Yet, for *judicial* elections, access and ingratiation are problematic. "A judge . . . is not elected to represent a particular viewpoint but must exercise his or her own independent authority to make decisions that uphold and apply the law fairly and impartially." *Common Cause*

*Indiana v. Individual Members of the Indiana Election Comm'n*, 800 F.3d 913, 923 (7th Cir. 2015). The public deserves a disinterested judiciary, free from the political horse-trading that occurs with other elected officials in the legislative and executive branches.

Professor Lawrence Lessig of Harvard University, an expert in the area of judicial ethics, has explored what the Framers of the U.S. Constitution would have considered "corruption." Lawrence Lessig, *The Brennan Center Jorde Symposium on Constitutional Law: What an Originalist Would Understand "Corruption" to Mean*, 102 Calif. L. Rev. 1 (Feb. 2014). As Professor Lessig explains:

> Until the end of the eighteenth century, "corruption" had a much broader meaning than it does today; it referred "less to the actions of individuals" than to the general moral health of the body politic judged according to "distributions of wealth and power, relationships between leaders and followers, the source of power and the moral right of rulers to rule."
>
> Thus, in the Framers' language, whole peoples, or societies could be corrupt - Rome, for example. Or institutions could be corrupt - Parliament, for example, corrupted by the king. Or individuals could be corrupt - as several Founders saw many throughout Britain to be. The point is not that "corruption" didn't include our modern sense of individual corruption - the "abuse of public office for private gain." It did. But it also included a collective sense - the corruption of an institution, or a people, and not just a person.

*Id* at 6.

In keeping with this, even the mere appearance of impropriety can lead to distortions in the public's confidence in the integrity of the judiciary—essential for the functioning of our constitutional republic. The discussion of corruption in *Citizens United* and its progeny is too narrow as applied to contests for judicial seats. The limitation in 10 ILCS 5/9-8.5(b-5)(1)(B) on individual non-resident campaign contributions in judicial elections is designed to address concerns with the appearance of corruption within the judicial branch.

**3. The purported out-of-state "ban" is not a ban, but an appropriately tailored regulation aimed at preventing corruption or the appearance thereof in judicial elections and preserving public perception of judicial integrity.**

As Plaintiffs acknowledge, the out-of-state contribution limit applies only to contributions to candidate committees; there is no limit on out-of-state donations to political parties or independent expenditure committees. Dkt. 6 at 2; Dkt. 1 at 23. Consistent with the State's goals in (1) preventing corruption and the appearance of corruption in judicial race, and thus (2) protecting the public's perception in the integrity of the judiciary, the out-of-state contribution limit is narrowly tailored to limit only out-of-state resident contributions to judicial candidate committees. An individual out-of-state resident is free to contribute to local or statewide political parties or independent expenditure committees, including independent expenditure committees that contribute to judicial candidates. Thus, out-of-state residents' speech is not completely curtailed, but merely limited. Out-of-state residents have alternate avenues of expressing their support for a judicial candidate without raising the specter of corruption through direct contributions to judicial candidates. Further, the interest identified in *Buckley v. Valeo,* of the symbolic importance of an individual contributing directly to a candidate that aligns with his or her political views, is of much less importance in judicial races; a judicial candidate should not be, and is not meant to be, responsive to their donors. 424 U.S. at 21.

Illinois is no stranger to the potential for political corruption. Nor is the corruption, perceived or actual, confined to the legislative or executive branches. For instance, Operation Greylord "was a highly publicized Federal investigation and series of criminal charges relating to instances of corruption by members of the Illinois bar and bench. As a result of the publicity attendant to Operation Greylord, numerous groups […] have discussed ways to improve the Illinois court system." *Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 257-58 (1st

Dist. 1991). The Northern District of Illinois and the Seventh Circuit are *still* dealing with the fallout from the judicial corruption uncovered in Operation Greylord, some 30 years later. *See Gacho v. Wills*, 986 F.3d 1067 (7th Cir. 2021) (reviewing denial of *habeas corpus* petition of defendant tried and sentenced before a judge implicated in Operation Greylord). Of course, the judicial corruption at issue in Operation Greylord is an extreme example of judges accepting bribes to rule certain ways in criminal cases, but even less pernicious scenarios could risk the collapse of public confidence. The ban on out-of-state contributions prevents a situation where outside donors dominate and control another state's judiciary. Such a situation could cast doubt upon the integrity of the judiciary should the public believe the court system beholden to foreign interests. While the potential for exerting pressure on elected officials may not be sufficient in the context of legislative and executive elections to show corruption, *Thompson v. Hebdon*, 7 F.4th 811, 824 (9th Cir. 2021), the considerations in a judicial election stand alone—concerns about ingratiation and access are valid when the integrity of the judiciary is potentially at issue.

In sum, the State has a compelling interest in avoiding not only corruption but any appearance of corruption, and this interest is heightened in the context of a judicial election given the importance of maintaining an independent and unbiased judiciary. Moreover, the out-of-state contribution ban is a limitation, not a ban, on out-of-state political speech in judicial elections in Illinois because it allows other avenues of expression (i.e., contributions to political party committees or independent expenditure committees). The individual out-of-state contribution limit for out-of-state residents in judicial elections is therefore narrowly tailored to accomplish its goals of preventing corruption and maintaining the public perception of integrity in the judicial system. Plaintiffs' claims should be dismissed.

**B. The $500,000 contribution limit to independent expenditure committees prevents the appearance of a judiciary subject to the whims of large, less transparent donors.**

Though many federal circuit courts have declined to determine whether strict or intermediate scrutiny applies to limits on contributions to independent expenditure committees, *see e.g., Barland*, 664 F.3d at 154, as discussed above, the intermediate scrutiny standard has traditionally been applied to challenges addressing limits on contributions. *Ill. Liberty PAC v. Madigan*, 904 F.3d 463, 469 (7th Cir. 2018). Because 10 ILCS 5/9-8.5(b-5)(1.2) deals with contribution limits, albeit in the context of contributions to independent expenditure committees, the intermediate scrutiny standard should be applied. Regardless of whether intermediate or strict scrutiny applies, however, the $500,000 limitation satisfies either.

At least as far back as the Magna Carta, courts have recognized the State's interest in the independence, impartiality, and integrity of the judiciary. *O'Toole v. O'Connor*, 802 F.3d 783, 789 (6th Cir. 2015) (citing *Williams-Yulee*, 575 U.S. at 445). Unlike elected officials who are tasked to represent the will of their constituents, the judiciary unquestionably plays a different role—a role that requires them to adjudicate matters before them without bending to public opinion. Because the distinct purpose of the judicial branch differs so greatly from that of the other political branches, the State has greater leeway in the regulation of judicial elections than otherwise. *Id.* at 792. As Justice Ginsburg has reminded, the very mission of a judge is to apply legal principles in an unbiased fashion and, indeed, to stand up to the popular will. *Republican Party v. White*, 536 U.S. 765, 803 (Ginsburg, J., dissenting). It is imperative that the judiciary owe "fidelity to no person or party," *id.*; this principle has assumed a central importance in our judicial system that has been unquestioned for centuries. *Id.*; *Williams-Yulee*, 575 U.S. at 445.

Thus, while it is generally recognized that the State may not limit contributions to organizations engaged only in making independent expenditures where the legislative or executive

branches are concerned, the unique nature of the judicial branch permits just such a limitation in judicial elections. For legislative and executive elections, courts have typically observed that actual or apparent *quid pro quo* corruption "is the only governmental interest strong enough to justify restrictions on political speech." *Barland*, 664 F.3d at 143. However, judicial elections occupy a separate realm: the State has an undisputed interest in "safeguarding the public confidence in the fairness and integrity of the nation's elected judges." *Williams Yulee*, 575 U.S. at 445 (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (internal quotations omitted)). Because the judiciary's authority derives not from "sword or purse" but rather upon public confidence, the "public perception of judicial integrity is [a] state interest of the highest order." *Id.* at 445-46 (internal citations and quotations omitted).

It is the public's confidence in the integrity and independence of the judiciary that is served by the $500,000 limit on contributions to independent expenditure committees. Where certain donors dominate contributions even to independent expenditure committees, the financial impact increases the risk that these donors will be able to exert outsized influence on the judges elected as a result of a committee's efforts. At the very least, such outsized contributions shake the public's perception of a fair judiciary unaffected by external influences. While ingratiation and access may not be corruption when dealing with elected officials whose very purpose is to represent constituents, *Citizens United*, 558 U.S. at 360, as discussed above, the considerations are far different in the context of the judiciary. And there is no question that outsized spending by select donors even in support of independent expenditures can create the appearance of a judiciary swayed by external pressures.

Illinois has not been untouched by fallout from massive spending in judicial elections. Following the 2004 Illinois Supreme Court election, multiple media outlets raised questions about

the impartiality of the Court's decision in a case involving State Farm—in the face of record spending on the race, much of it allegedly coming from State Farm through both campaign contributions and spending through 501(c)(4) or (c)(6) organizations.[5] In a 2013 empirical analysis conducted by Joanna Shepherd, the author concluded that between 2010-2012, there was a "statistically significant, positive relationship between campaign contributions from business grounds and justices' voting in favor of business interests." Shepherd, *Justice at Risk*, at 9. While the study discussed campaign contributions in relation to state supreme court decisions, the author still noted that "business groups routinely fund independent expenditures in the form of television advertising for favored candidates." *Id*. at 9. There is no reason to believe that immense funding from independent expenditure committees cannot taint at least the public perception of the judiciary—an incredibly grave concern for the State and its interest in the legitimacy of the rule of law. Importantly, the State is not required to present documentary evidence to supports its contention of threats to public confidence in the integrity of the judiciary, so important is the principle of a structurally independent judiciary to our constitutional republic. *French v. Jones*, 876 F.3d at 1241. Thus, despite Plaintiffs' contrary suggestion, while independent expenditures may not create a risk of *quid pro quo corruption* as a matter of law, they can create the perception of a judiciary subject to the whims of major donors.

---

[5] Jim Suhr, "Appeal Questions Justice, Fairness," *Springfield Journal-Register* (September 15, 2011), *available at* https://www.sj-r.com/story/news/state/2011/09/15/appeal-questions-justice-s-fairness/41745962007/ (last visited Aug. 23, 2022); Alison Frankel, "Behind $250 million State Farm settlement, a wild tale of dark money in judicial elections," Reuters (September 5, 2018), *available at* https://www.reuters.com/article/legal-us-otc-darkmoney-idINKCN1LL2ZQ (last visited Aug. 23, 2022); Debra Cassens Weiss, "State Farm to pay 250M to settle suit claiming it orchestrated win of justice who voted its way," ABA Journal (September 10, 2018), *available at* https://www.abajournal.com/news/article/state_farm_to_pay_250m_to_settle_suit_claiming_it_orchestrated_win_of_justi (last visited Aug 23, 2022); Michael J. Bologna, "State Farm Settlement Lets Dark Money Remain in Shadows," Bloomberg Law (September 13, 2018), *available at* https://news.bloomberglaw.com/us-law-week/state-farm-settlement-lets-dark-money-remain-in-shadows (last visited Aug. 23, 2022).

In light of its compelling interest in the independence of its judiciary, the State's laws regulating donor influence are narrowly tailored to achieve its goal. Plaintiffs argue that allowing individuals to make unlimited independent expenditures or unlimited direct contributions when the State's waiver provision kicks in where a candidate self-funds in excess of $100,000 or more than $100,000 in independent expenditures is spent in a race, demonstrates that the $500,000 limit on contributions to independent expenditure committees is unconstitutional. Dkt. 5 at 13. But this argument overlooks the differences in the accessibility of information for individual expenditures and direct contributions to candidates versus contributions to independent expenditure committees.

While individuals who make independent expenditures totaling over $3,000 must file a written disclosure with the State Board of Elections, 10 ILCS 5/9-8.6(a), and candidates receiving contributions must disclose the full name and mailing address of any individual who contributed more than $150 to his campaign, *Proft v. Raoul*, 944 F.3d 686, 692 (7th Cir. 2019), independent expenditure committees can more easily conceal information about their donors. Even here, Plaintiffs allege that Restoration PAC would like to contribute in excess of $500,000 to Fair Courts America, another PAC, which obscures the ultimate source of the donation and requires greater exploration on the part of voters who wish to be informed. Given the potential to obfuscate the potential exertion of substantial influence on judicial candidates through funding by independent donors, the State's decision to refrain from regulating *more* does not a constitutional violation make. *See also Williams-Yulee*, 575 U.S. at 448 (noting that it is "counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech").

Thus, Plaintiffs' arguments regarding the limit on contributions to judicial independent expenditure committees fail because the limit serves an important governmental interest and does so without offending either strict or intermediate scrutiny.

**C.    The Eleventh Amendment bars Plaintiffs' claims against the State Board of Elections.**

In addition to failing on the merits, Plaintiffs' claims against the State Board of Elections are also barred by the Eleventh Amendment. Here, Plaintiffs assert claims against State Board of Elections, a state agency, but it is well-established that the Eleventh Amendment provides immunity to states and state agencies (as "arms of the state"). *Joseph v. Bd. of Regents of Univ. of Wisconsin Sys*., 432 F.3d 746, 748 (7th Cir. 2005) (citing *Kroll v. Bd. of Trustees of Univ. of Ill*., 934 F.2d 904, 907 (7th Cir. 1991) and *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989)). Moreover, the Supreme Court has determined that neither a State nor its agencies are "persons" subject to suit under Section 1983. *Will*, 491 U.S. at 71; *see also Kroll*, 934 F.2d at 910 n.7 (noting, as an alternative basis for dismissal, that "a state agency with eleventh amendment immunity. . . is not a 'person' within the meaning of section 1983"). Because Plaintiffs' claims against the State Board of Elections are barred by the Eleventh Amendment, they should be dismissed with prejudice.

**II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.**

If the Court does not dismiss Plaintiffs' claims on the merits, it should nonetheless deny their motion for a preliminary injunction, because Plaintiffs cannot show they are entitled to that "extraordinary remedy," *Winter*, 555 U.S. at 24, while this case proceeds.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *accord Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (a preliminary injunction should "never" issue "except in a case clearly demanding it"). A plaintiff seeking such a remedy must show that he is likely to succeed on the merits, and that he will suffer irreparable harm if preliminary relief is denied. *Winter*, 555 U.S. at

20; *Cassell*, 990 F.3d at 544-45. "If these threshold factors are met, the court proceeds to a 'balancing phase,'" in which it balances "the irreparable harm to the moving party if relief is denied" against "the irreparable harm the non-moving party will suffer if preliminary relief is granted" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545 (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). It performs that analysis using a "sliding scale" approach, under which "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* The Court's ultimate task is to "equitably weigh" all the "factors together, 'seeking at all times to minimize the costs of being mistaken.'" *Cassell*, 990 F.3d at 545 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

Plaintiffs cannot show that this is a case "clearly demanding" extraordinary relief, *id.* at 544, while it proceeds to judgment. Plaintiffs cannot make the "threshold" strong showing on the merits and irreparable harm. In addition, the equities tip decidedly against them. Plaintiffs ask the Court to "swoop in and re-do" Illinois's campaign-finance regime, *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), *weeks* before the general-election ballots are mailed and two months before Election Day. They make this last-minute request despite waiting months to bring suit—in Plaintiff Chancey's case the better part of a year. The Court should reject Plaintiffs' claims of a manufactured emergency and decline to upend Illinois' electoral process in this manner. If Plaintiffs' claims have merit, they may prove them in due course before the 2024 election. But the Court should not change the rules of the 2022 election cycle mere months before voters go to the polls.

### A. Plaintiffs are unlikely to succeed on the merits of their claims.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter*, 555 U.S at 20. As recently restated by the Seventh Circuit, "an applicant for a preliminary relief bears a significant burden." *Ill. Republican Party*, 973 F.3d at 763. Plaintiffs must make a "strong" showing that "normally includes a demonstration of how the applicant proposes to prove the key elements of [their] case." *Id*. Here, for the reasons explained above in support of the Defendant's Motion to Dismiss, Plaintiffs have failed to establish *any* likelihood of success on the merits of their claims, much less that success is "likely," *Winter*, 555 U.S. at 20, and their preliminary injunction motion may be denied for this reason alone.

### B. Plaintiffs have not demonstrated irreparable harm.

Plaintiffs' motion should also be denied because they cannot establish irreparable harm. Again, Plaintiffs' burden is a high one: They must make a "clear showing" that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 2 (emphasis in original). Plaintiffs cannot meet that burden. Most basically, Plaintiffs have not shown irreparable harm because they cannot show they have suffered any constitutional wrong. *Supra* at 3-15.

Apart from Plaintiffs' failure to present a plausible case on the merits, they also do not and cannot show that irreparable harm is *likely*. To start, Plaintiffs' Complaint asserts that Chancey "seeks to donate money to individuals in Illinois" from Texas, where he resides. Compl. ¶ 3. But Chancey's bare assertion that he seeks to donate money to certain judges in Illinois is unsupported by any evidence. Moreover, Chancey has submitted no evidence that he has any history of participating in elections through contributions. Chancey, therefore, has submitted no evidence adequate to establish a threat of *likely* irreparable harm needed to justify the extraordinary relief he seeks here.

Plaintiffs' lengthy delay in filing its motion also demonstrates the lack of an urgent need for preliminary relief. *See Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) ("A lengthy, unexplained delay in seeking relief calls into question how urgent the need for preliminary equitable relief really is.") (cleaned up); *Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002) (similar); 11A *Federal Practice & Procedure* § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). The provision limiting out-of-state contributions went into effect November 15, 2021, over nine months ago. *See* 10 ILSC 5/9-8.5(b-5)(1). Chancey identifies no reason why he could not have sought relief sooner. Even the independent-expenditure provision has now been law for three months (since May 27, 2022). *Id.* 5/9-8.5(b-5)(1.2). Plaintiffs' delay in challenging these provisions thus strongly undermines their unsubstantiated assertion that they will experience irreparable harm if the 2022 election cycle proceeds under current law.

C.    **If the Court reaches the "balancing" phase, it should deny preliminary relief while the case proceeds.**

If the Court reaches the "balancing phase," *Ill. Repub. Party*, 973 F.3d at 763, it should still not issue a preliminary injunction. At this stage, the Court considers "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied," and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. The ultimate goal is to "minimize the costs of being mistaken" while the case proceeds to judgment. *Id.*

Here, Plaintiffs' asserted interests are far outweighed by the State's "interest in enforcing democratically enacted statutes and maintaining the integrity of the electoral process," *Proft v. Raoul*, 944 F.3d 686, 693 (7th Cir. 2019), especially given the late date. As discussed, Plaintiffs

have failed to show a serious likelihood that they will face irreparable harm absent a preliminary injunction: Plaintiff Chancey has not contributed to an Illinois candidate for elected office in at least two decades, and all plaintiffs waited months—in Chancey's case, the better part of a year—to bring suit and seek emergency relief. The Court should not upend the rules of the 2022 election on such a slender showing.

By contrast, the cost of entering an injunction altering Illinois's carefully calibrated laws governing the financing of judicial elections two months before the 2022 general election would be substantial. The U.S. Supreme Court has repeatedly emphasized that federal courts should not "change electoral rules close to an election date." *Democratic Nat'l Comm.*, 977 F.3d at 641; *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."); *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). As one Justice has explained, "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Id.*

But Plaintiffs ask the Court to do exactly that—to "swoop in and re-do" Illinois's laws governing the financing of state judicial elections two months before the 2022 general election, having waited months (and in Chancey's case, the better part of a year) to file suit. *Id.* Indeed, in many senses the 2022 election is already at hand. The State Board of Elections is required by law to certify the general election ballot today—August 26, 2022—and county and city election

authorities begin printing and mailing ballots in September.[6] Over the last year, in preparation for the 2022 election, the Board has promulgated guidance regarding the contribution limits applicable to state judicial elections, among others.[7] And "candidates, political parties, and voters," *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), have raised and contributed funds under the existing legal framework. The disruption of these settled plans and expectations would be substantial, sparking confusion among state officials as well as candidates. Given the late hour of this lawsuit, the State Board of Elections would be required to issue hasty guidance to candidates about changes in the law; candidates and campaigns would be required to turn around and revise their fundraising and campaigning strategies to accommodate the last-minute change; and voters and donors all across Illinois would have to change their own contribution plans in light of the influx of funds that would potentially pour into the State's judicial elections. *See Hispanic Leadership Fund, Inc. v. Walsh*, No. 1:12-cv-1337, 2012 U.S. Dist. LEXIS 189367, at *44-46 (N.D.N.Y. Oct. 23, 2012) (observing, in campaign finance case, that the "balance of equities favors denying the preliminary injunction because it would disrupt the justifiable expectations of the individuals and entities that have and continue to comply with the challenged provisions").

The Court should not upend Illinois campaign finance law for the 2022 election in the final two months of the election cycle based solely on Plaintiffs' self-created emergency. If the goal in adjudicating Plaintiffs' request for injunctive relief is to "minimize the costs of being mistaken"

---

[6] *See* Ill. St. Bd. of Elecs., *2022 Election & Campaign Finance Calendar* 38-42, https://www.elections .il.gov/DocDisplay.aspx?Doc=/Downloads/ElectionOperations/PDF/2022ElectionCalendar.pdf&MID=38 (last updated Feb. 7, 2022).

[7] *See, e.g.*, Ill. St. Bd. of Elecs., *Disclosure of Campaign Contributions and Expenditures*, https://www.elections.il.gov/DocDisplay.aspx?Doc=/Downloads/CampaignDisclosure/PDF/CampDiscAc t.pdf&MID=158 (last updated June 2022); Ill. St. Bd. of Elecs., *A Guide To Campaign Disclosure*, https://www.elections.il.gov/DocDisplay.aspx?Doc=/Downloads/CampaignDisclosure/PDF/CampDiscGu ide.pdf&MID=124 (Aug. 2021); Ill. St. Bd. of Elecs., *Contribution Limits Per Election Cycle*, https://www.elections.il.gov/DocDisplay.aspx?Doc=/Downloads/CampaignDisclosure/PDF/Contribution Summary.pdf&MID=287 (last visited Aug. 25, 2022).

while the case is pending, *Cassell*, 990 F.3d at 545, the appropriate course is to deny emergency relief while the case proceeds to judgment. Plaintiffs may litigate their constitutional claims in full, on a complete trial record, before the 2024 election. But the Court should decline Plaintiffs' invitation to "swoop in," *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), and change the rules of the 2022 election cycle, disrupting the rules for candidates, campaigns, and voters at the last minute.

## CONCLUSION

For the foregoing reasons, Defendant Raoul respectfully requests that the Court grant his motion to dismiss and deny Plaintiffs' motion for a preliminary injunction.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>KWAME RAOUL<br>Attorney General of Illinois</td><td>By:    <u>/s/ *Erin Walsh*</u><br>Erin Walsh<br>Marci L. Sahinoglu<br>Assistant Attorneys General<br>100 W. Randolph Street, 13th Floor<br>Chicago, Illinois 60601<br>erin.walsh@ilag.gov<br>marci.sahinoglu@ilag.gov<br><br>*Counsel for Defendants*</td></tr>
</table>