**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN MATTHEW CHANCEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 22 CV 04043 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THE ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs challenge two recently enacted provisions of the Illinois Election Code as violative of their First Amendment rights to free speech. Both provisions regulate campaign financing during state judicial elections. The first prohibits judicial candidate committees from receiving any contributions from an out-of-state person. The second caps the amount that any independent expenditure committee established to support or oppose a judicial candidate can receive from any single source during an election cycle at $500,000. The plaintiffs seek to preliminarily enjoin the defendants from enforcing these two provisions during the upcoming November 8, 2022, election, a permanent injunction to the same effect for future election cycles, and a declaratory judgment that these two provisions are unconstitutional. Defendant Illinois Attorney General Kwame Raoul has moved to dismiss the plaintiffs' complaint for failure to state a claim and opposed the plaintiffs' motion for preliminary injunction. For the reasons set forth below, the plaintiffs' motion for a preliminary injunction is granted, and the motion to dismiss is denied because the plaintiffs, having shown they have some likelihood of success on the merits, necessarily have also demonstrated that they have stated a plausible claim for relief.

## BACKGROUND

For the most part, state court judges in Illinois are elected officials.[1] The Illinois Election Code regulates various aspects of state and local elections, including campaign financing for judicial elections. *See* 10 ILCS 5/9-1 *et seq*. It imposes, *inter alia*, disclosure, reporting, accounting, and spending requirements and contribution limits for the various kinds of political committees that are formed to support or oppose candidates for office.

Candidates for judicial office in Illinois, like candidates for other elected positions, organize (or designate) candidate political committees to facilitate their campaigns. The Code defines "candidate political committee" as, "the candidate himself or herself or any natural person, trust, partnership, corporation, or other organization or group of persons designated by the candidate that accepts contributions or makes expenditures during any 12-month period in an aggregate amount exceeding $5,000 on behalf of the candidate." 10 ILCS 5/9-1.8. Each candidate can only have one candidate committee.

The Code also regulates other types of political committees that seek to receive, contribute, and spend money to support or oppose candidates in state and local elections. *See* 10 ILCS 5/9-1.8(a)-(f) (defining the types of political committees governed by Art. 9 of the Code). One such type of committee is an "independent expenditure committee," or IEC. As the name implies, IECs are formally independent from the candidate committees, and they are subject to special rules. By definition, they exist either to make "independent expenditures" in support of or opposition to candidates or public policy positions, or to make electioneering communications on those subjects

---

[1] The associate judges in each judicial circuit, for instance, are appointed by the Circuit Court judges from those circuits. Illinois Const., Art. VI, §8. Further, in the event of a midterm vacancy on the Illinois Supreme, Appellate, or Circuit Courts, the Illinois Supreme Court justices appoint interim judges to fill those vacancies until elections are held. *See* Illinois Const., Art. VI, §12(c); Judicial Vacancies Act, 705 ILCS 40.

to voters. 10 ILCS 5/9-1.8(f). "Independent expenditures" cannot be made in concert with the candidates' campaigns or political committees. 10 ILCS 5/9-1.15. Electioneering communications are subject to the same restriction. *Id*. Under no circumstance may an IEC "give any money directly to a candidate committee." Compl. ¶ 31 (citing 10 ILCS 5/9-8.5(b)).

*Election Code Provisions at Issue*

The Illinois legislature recently made a series of changes to the Election Code. Two of those changes are at issue in this case, and they only come into effect during judicial elections. They reflect Illinois' decision to treat some aspects of fundraising for judicial elections differently from fundraising for executive or legislative elections.

First, enacted on November 15, 2021, Illinois Senate Bill 536 (Public Act 102-0668) amended the Code by prohibiting any judicial candidate political committee from "accept[ing] contributions from any out-of-state-person…" 10 ILCS 5/9-8.5(b-5)(1)(B).[2,3] The statutory amendment provides that any "political committee that receives a contribution in violation of this Section" must dispose of or return the contribution, or else the contribution escheats to the State's General Revenue Fund and the committee will be "subject to a civil penalty not to exceed 150%

---

[2] See 10 ILCS 5/9-1.4(A)-(B), for the Election Code's definition of "contribution"; see also 10 ILCS 5/9-8.5(A)-(B), for an additional definition of "contribution" in the same provision as the prohibition on out-of-state contributions to judicial candidate political committees.

[3] The Election Code does not define "out-of-state" or "out-of-state person," but the Illinois State Board of Elections has adopted rules set forth in the Illinois Administrative Code, which defines "out-of-state person" as "includ[ing] but [] not limited to any of the following:"

A) a natural person whose primary residence lies outside the geographic boundaries of the State of Illinois;

B) a person, as defined in Code Section 9-1.6, other than a natural person, who does not operate an office, branch location, or place of business situated in this State, and does not have employees, agents or representatives in this State.

Ill. Admin. Code tit. 26, § 100.75(j)(2).

of the total amount of the contribution." 10 ILCS 5/9-8.5(j). The Code only distinguishes between in- and out-of-state contributions to candidate committees for the purposes of judicial elections; there is no bar to out-of-state contributions to candidate committees in executive or legislative elections. No provision of the Code prohibits out-of-state persons from contributing to other types of political committees involved in judicial elections, *e.g.*, political party committees or IECs.

Second, enacted on May 27, 2022, Illinois House Bill 0716 (Public Act 102-0909) added a provision prohibiting any "independent expenditure committee established to support or oppose a candidate seeking nomination, election, or retention to the Supreme Court, the Appellate Court, or the Circuit Court" from "accept[ing] contributions from any single person in a cumulative amount that exceeds $500,000 in any election cycle." 10 ILCS 5/9-8.5(b-5)(1.2). Section 9-8.5(b-5)(1.2) of the Code further provides that "[a]ny contribution [to an IEC by a single person] in excess of [$500,000 in an election cycle] shall escheat to the State of Illinois." IECs are required to immediately forward any amount received by an individual that exceeds $500,000 to the State Treasurer who shall deposit the funds into the State Treasury. 10 ILCS 5/9-8.5(b-5)(1.2). In contrast, the Code does not restrict the amount of money that an IEC established to support or oppose a candidate running for a non-judicial office may receive from any single person.

*Other Relevant Portions of the Election Code*

Since these new provisions are embedded within a complicated framework of campaign financing, spending, and disclosure rules, it is necessary to understand how they interact with preexisting rules. First, the Code imposes general limits on the amounts that donors may contribute directly to a candidate committee (as distinguished from an IEC) for all races, including judicial races. Those limits are: $5,000 from any individual; $10,000 from any corporation, labor organization, or association; and $50,000 from a candidate political committee or political action

4

committee.[4] 10 ILCS 5/9-8.5(b). There is no limit, however, to how much political party committees may contribute to candidate committees during general elections (except during primary elections). Compl. ¶ 31 (citing 10 ILCS 5/9-8.5(b)).

The Code lifts these limits on direct contributions to candidate committees in two circumstances. The Court will refer to these as the "self-funding waiver" and the "independent-expenditure waiver," respectively. In both of these circumstances, the Board notifies all candidates running in the race that these waivers have been triggered, and the 10 ILCS 5/9-8.5(b) direct contribution limits (discussed in the preceding paragraph) are lifted for all candidates in that race. In non-judicial races, both of these waivers remove any limit on direct campaign contributions. In judicial races, however, the degree to which the contribution limits are lifted depends on which waiver is triggered.

The self-funding waiver is triggered when a candidate or his immediate family contributes to the candidate's committee during the 12 months prior to an election (*i.e.*, a candidate self-funds) in an aggregate amount of more than (i) $250,000 for statewide office or (ii) $100,000 for all other elective offices. 10 ILCS 5/9-8.5(h). The Code does not treat any judicial office as a "statewide office." *See* 10 ILCS 5/9-8.5(k). Therefore, once a judicial candidate self-funds in excess of $100,000, the self-funding waiver kicks in, and candidate committee contribution limits increase for that race. In judicial elections, the $5,000 (individual), $10,000 (corporation, union, association), $50,000 (candidate committee or PAC) candidate committee contribution limits are

---

[4] A "political action committee" (PAC) is a distinct type of political committee. *See* 10 ILCS 5/9-1.8(d) (defining "political action committee."). Neither of the challenged provisions in this case impose restrictions specific to PACs. IECs are essentially independent-expenditure-only PACs, *see* 10 ILCS 5/9-1.8(f), and the two types of committees are subject to different rules and limits under the Code.

increased to $500,000 regardless of the category of contributor. *See* 10 ILCS 5/9-8.5(b-5)(1.1).[5]
For non-judicial races, the triggering of the self-funding waiver lifts the contribution limits
entirely, *i.e.*, anyone can then make unlimited contributions to the candidate committees. *See* 10
ILCS 5/9-8.5(h).

The independent-expenditure waiver is triggered when an individual or IEC makes
independent expenditures in support of or in opposition to a candidate in an aggregate amount of
more than (i) $250,000 for statewide office or (ii) $100,000 for all other elective offices in an
election cycle. 10 ILCS 5/9-8.5(h-5). Again, the Code does not treat any judicial office as a
"statewide office." Therefore, when an individual or IEC spends $100,000 or more in support of
or in opposition to a judicial candidate, the independent-expenditure waiver kicks in, and candidate
committee contribution limits are completely removed for that judicial race. *Id*. In other words,
anyone (except an IEC) can make unlimited contributions directly to the candidate committee
when the independent-expenditure waiver kicks in.

The Code also contains numerous provisions aimed at increasing transparency in campaign
financing. Some apply to all elections, and some are geared toward judicial elections specifically.
The Code requires individuals making independent expenditures in excess of $3,000 to file
disclosures with the ISBE.[6] 10 ILCS 5/9-8.6(a). All political committees, including candidate
committees and IECs, are required to "file quarterly reports of campaign contributions,

---

[5] The new $500,000 limit does not apply to additional self-funding from the candidate or
his family. *Id*.

[6] Once the individual makes independent expenditures in excess of $3,000, they "have a
continuing obligation to report further expenditures in relation to the same election, in $1,000
increments, to the State Board until the conclusion of the election…. Each disclosure must identify
the natural person, the public official or candidate supported or opposed, the date, the amount, and
nature of each independent expenditure, and nature of each independent expenditure, and the
natural person's occupation and employer." 10 ILCS 5/9-8.6(a).

expenditures, and independent expenditures." 10 ILCS 5/9-10(b); see 10 ILCS 5/9-11 for the information that is required in these reports. For contributions in excess of $150, the quarterly financial report must contain, *inter alia*, details about the identity of the source, amount, and date of those contributions. 10 ILCS 5/9-11(a)(4). Information regarding any contribution of $1,000 or more must be filed within 5 business days of receipt. 10 ILCS 5/9-10(c). All political committees established to support or oppose a judicial candidate are prohibited from receiving contributions greater than $500 from any committee, association, organization, or other group of persons that is not required to disclose its contributors under the Code. 10 ILCS 5/9-8.5(b-5)(1.3).

*The Parties*

The plaintiffs claim that the two recently enacted Election Code provisions are unconstitutional because they impose undue restrictions on certain modes of political participation in judicial races. Plaintiff John Matthew Chancey specifically challenges the provision prohibiting judicial candidate committees from accepting contributions from out-of-state persons, 10 ILCS 5/9-8.5(b-5)(1)(B). Chancey lived in Illinois for 63 years before retiring to Texas. Some of his professional and personal acquaintances from his time practicing law in Illinois are running for judicial office in the November 8, 2022, elections. He seeks to donate money to them. But since he now resides in Texas, and thus qualifies as an "out-of-state person," the judicial candidate committees to which he seeks to contribute cannot accept his contributions under the amended Election Code.

Plaintiffs Fair Courts America (FCA) and Restoration PAC are IECs established to support or oppose judicial candidates in the upcoming election. They challenge the new provision prohibiting IECs from accepting contributions greater than $500,000 from any single individual donor, 10 ILCS 5/9-8.5(b-5)(1.2). They each claim they seek to receive contributions from certain

unidentified prospective donors in excess of an aggregate amount of $500,000 per donor. Restoration PAC also seeks to contribute an amount in excess of $500,000 to FCA in furtherance of its efforts to support or oppose Illinois judicial candidates. Plaintiffs FCA and Restoration PAC are restricted from receiving (and, in Restoration PAC's case, also making) these contributions as IECs under the amended Code.

The defendants are members of the Illinois State Board of Elections, which is the unit of Illinois state government responsible for investigating and holding enforcement hearings regarding violations of the Election Code, 10 ILCS 5/9-18, and Kwame Raoul, who is the Attorney General of the State of Illinois and prosecutes violations of the Illinois Code's provisions restricting campaign contributions. 10 ILCS 5/9-25.2. The plaintiffs also initially named the Illinois State Board of Elections as a defendant. Per the parties' agreed motion, ECF No. 15, however, the Court dismissed the ISBE from this suit. ECF No. 18. By agreement of the parties, the Court also excused the Board Member defendants from answering or otherwise actively participating in the case. *Id.*

## ANALYSIS

Although neither party has called the Court's subject-matter jurisdiction into doubt, the Court must nevertheless ensure it remains "secure at all times." *See Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853 (7th Cir. 2012). Constitutional standing is essential to the Court's exercise of jurisdiction. *Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013). The Seventh Circuit has elucidated the connection between the judicial power under the Constitution and the doctrine of standing:

> Article III of the Constitution limits the judicial power to "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1, a limitation understood to confine the federal courts to the traditional role of Anglo–American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. The doctrine of standing enforces this limitation.

*Id*. (cleaned up). "To invoke the authority of a federal court, a litigant must have 'an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling.'" *Id*. at 667 (quoting *Horne v. Flores*, 557 U.S. 433, 445 (2009)).

Plaintiff Chancey claims he would donate to various judicial candidate political committees but for the law prohibiting such out-of-state direct contributions. Plaintiffs FCA and Restoration PAC claim they seek to receive contributions from at least some prospective donors in excess of an aggregate amount of $500,000 per donor but are prohibited from doing so by the Code's limit on contributions to IECs. Restoration PAC also claims it would make such a contribution to co-plaintiff FCA but for that same limit. The plaintiffs do not claim that the defendants have prosecuted them or otherwise enforced the Code's restrictions against them thus far, but they do outline the enforcement mechanisms for these new provisions in their complaint, and the Court sees no reason why the State would not pursue those mechanisms if violations occur. In pre-enforcement First Amendment cases such as this, the specter of enforcement places a chill on the speech of prospective contributors—here, Chancey and Restoration PAC—and constitutes a cognizable and redressable harm. Thus, it is not necessary for the plaintiffs to "risk prosecution or otherwise await enforcement of the statute" before suing. *Wisconsin Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 147 (7th Cir. 2011). Further, FCA and Restoration PAC adequately allege injury in their capacities as "contributee" organizations; since they cannot accept certain donations, they have standing to sue on behalf of their would-be contributors who, though unnamed, FCA and Restoration PAC plausibly allege exist. *See id*. at 147-48.

With the plaintiffs' standing secure, the Court now turns to the merits of the plaintiffs' motion for a preliminary injunction. To obtain a preliminary injunction, "the moving party must

demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). If the moving party makes such a threshold showing, the Court balances the equities, *i.e.*, it "weighs the competing harms to the parties if an injunction is granted or denied," and in so doing, the Court "also considers the public interest." *Id*. This is "a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor. The aim is to minimize the costs of a wrong decision." *Id*. The Court addresses each of these elements in turn, starting with the likelihood of success on the merits for each of the challenged provisions.

## I.      Likelihood of Success on the Merits

To succeed on the merits, the plaintiffs first need to show that Illinois has burdened their speech. They have made such a showing, and the defendants do not dispute it. "Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of" our system where many governmental officials hold elected office. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (*per curiam*). The Seventh Circuit has also applied Supreme Court precedent to hold that limits on contributions to entities engaged in independent spending in support of candidates burden speech. *See generally Barland*, 664 F.3d 139. Here, one challenged provision prohibits judicial candidate committees from accepting any donations from out-of-state persons. The other caps the aggregate amount that IECs can accept from any single donor at $500,000. That these are provisions regulating financing in judicial elections specifically does not diminish the existence or quality of the burden on the plaintiffs' speech. Where a state's judiciary is elected, restrictions on "[t]he right of citizens to inquire, to

hear, to speak, and to use information to reach consensus," *Citizens United v. FEC,* 558 U.S. 310, 339 (2010), about candidates' fitness for the bench call into question whether the government is animated by a valid interest in enacting those restrictions, the importance of that interest, and to what degree the restrictions are tailored to actually serve the interest. *See, e.g.*, *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) (discussing the importance of public debate on judicial candidates' qualifications and views). That is, there is no reason to suspect that political speech during judicial elections is any less valuable than speech during elections for other types of office.

The State has invoked the same interest for both provisions, and the Supreme Court has previously deemed that interest compelling in a related context. Illinois contends it enacted the two provisions to protect its interest in preserving public confidence in a fair and disinterested judiciary. That is, both the integrity and appearance of integrity of the Illinois state judiciary are at stake absent the provisions in question, according to the State. The Supreme Court has held that this interest is compelling, though that was in a different (but related) context. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (holding that a canon of a state's code of judicial conduct prohibiting judicial candidates from personally soliciting funds for their campaigns is narrowly tailored to serve the state's compelling interest in preserving public confidence in the integrity of its judiciary). The plaintiffs do not dispute that this interest is generally a compelling one. They do dispute, however, that the interest can justify the speech-burdening restrictions at issue here. That depends in part on whether the restrictions are appropriately tailored to serve the governmental interest.

### A.    Count I: Illinois' Prohibition on Contributions from Out-of-State Persons to Judicial Candidate Committees

The parties dispute the level of tailoring required for the prohibition on judicial candidate committees from accepting out-of-state contributions to survive: the intermediate "closely drawn"

standard occasionally used in the campaign-finance context, or strict scrutiny's "narrowly tailored" standard. It is not necessary for the Court to reach a definitive conclusion here. The provision fails even under the closely drawn standard, which is "a lesser but still 'rigorous standard of review.'" *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (quoting *Buckley*, 424 U.S. at 21).

Since the Court will be analyzing the provision under the closely drawn standard, some background is necessary. Since *Buckley*, the Supreme Court has "recognized that contribution limits, unlike limits on expenditures, 'entai[l] only a marginal restriction upon the contributor's ability to engage in free communication.'" *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 134 (2003) (quoting *Buckley*, 424 U.S. at 20). The reason the restriction is marginal is because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." *Buckley*, 424 U.S. at 21. Further, other than their marginal symbolic effect, contributions "involve speech by someone other than the contributor." *Id*. at 161-62. The contributor is essentially paying someone else to engage in speech that the contributor presumably agrees with or would like to hear. Accordingly, in cases where campaign contributions are at issue, courts examine whether "the restriction at issue [is] 'closely drawn' to serve a 'sufficiently important interest.'" *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 735 (2011) (quoting *McConnell*, 540 U.S. at 136). In contrast, restrictions on political expenditures merit strict scrutiny because they "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19; *see also Barland*, 664 F.3d at 152-53. Furthermore, the Supreme Court has held that the "closely drawn" standard applies regardless of whether a court is confronted with a ban or a limit on contributions. *See*, *e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (upholding ban on direct corporate contributions under the

12

closely drawn standard); *McConnell*, 540 U.S. at 231-32 (applying closely drawn standard to strike a ban on contributions from individuals seventeen years old or younger as violative of First Amendment); *see also Wagner v. FEC*, 793 F.3d 1, 5 (D.C. Cir. 2015) ("The Supreme Court has repeatedly applied this 'closely drawn' standard to challenges to campaign contribution restrictions." (collecting cases)). This is important because the ban-limit distinction becomes relevant in the tailoring analysis, not at the initial stage of selecting the appropriate level of scrutiny.

Is the provision at issue here closely drawn to serve Illinois' sufficiently important interest of preserving the appearance of a fair and disinterested judiciary? Likely not. In order to be "closely drawn," the restriction must be "above the 'lower bound' at which 'the constitutional risks to the democratic electoral process become too great.'" *Illinois Liberty PAC v. Madigan*, 904 F.3d 463, 470 (7th Cir. 2018) (plurality opinion) (quoting *Randall v. Sorrell*, 548 U.S. 230, 248 (2006). The State has failed to adequately explain at this stage how its complete prohibition of an entire *source* of money based solely on geography is a valid—*i.e.,* closely drawn—method of protecting the public's confidence in the integrity and independence of the state judiciary.

To be sure, a state's interest in preserving public confidence in the integrity of its judiciary may in some cases justify certain restrictions on speech relating to judicial campaign contributions that would not survive scrutiny if similarly applied during representative elections. This is because "a State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections." *Williams-Yulee*, 575 U.S. at 447. And the manner in which judicial campaigns raise funds can result in damage to the public's perception of the judiciary's integrity. In *Williams-Yulee*, for example, the Supreme Court upheld a rule restricting judicial candidates from personally soliciting

campaign contributions because such conduct may create the "regrettable but unavoidable" appearance of diminished judicial integrity. *Id*. Moreover, the State is correct in pointing out that this is not a total ban on out-of-state participation in public debate surrounding judicial elections in Illinois, even via financial contributions. It just prohibits one way that out-of-staters like Chancey can participate, *i.e.*, via contributions directly to a candidate committee. Chancey can still make unlimited independent expenditures in support of his desired candidates, donate to the candidates' political parties (who can then donate directly to the campaigns if they so choose), and/or donate to IECs, such as his fellow plaintiffs. But the mere existence of alternative methods of participation does not save the challenged provision from being a poor fit, nor does it change the fact that Chancey is precluded from symbolically associating himself with the candidates he supports. Even if *Buckley* held that that sort of symbolic speech is comparatively less significant than other types of political speech, that does not mean the State can eliminate it without good reason.

The special nature of judicial elections does not justify Illinois' differential treatment of in- and out-of-state contributors in this manner. The Court cannot ignore the gravity of the restriction with which it is faced: A state law prohibits an entire class of people from engaging in a distinct category of political expression during the electoral process.[7] *See Randall v. Sorrell*, 548 U.S. 230, 249-53 (2006) (plurality opinion) (holding that individual contribution limits ranging from $200-400 are too low to survive scrutiny.). The State claims that "[t]he ban on out-of-state contributions prevents a situation where outside donors dominate and control another state's judiciary. Such a

---

[7] That this is a ban, rather than a limit, on out-of-state contributions to judicial candidate committees is relevant to this stage of the Court's analysis, not to the level of scrutiny it should apply. *See Beaumont*, 539 U.S. at 162 ("It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself.").

situation could cast doubt upon the integrity of the judiciary should the public believe the court system beholden to foreign interests." Def.'s Resp. at 11. But why would it matter whether funds sufficient to cast doubt on the integrity of the judiciary originate in-state rather than out of state? The State does not (and cannot) explain why money is more corrupting simply because its source is from outside the state, so the premise that the out-of-state ban on campaign contributions materially enhances the state judiciary's appearance of integrity is entirely without foundation.

The asymmetry between how the Election Code treats the injection of foreign money into judicial campaigns versus in-state money, moreover, belies the notion that this provision is closely drawn to serve the stated goal of preserving public confidence in the integrity of the judiciary. To illustrate, as the law currently stands, an individual residing in Illinois can contribute up to $5,000 to a judicial candidate committee under normal circumstances, and an out-of-state person can contribute nothing. There does not appear to be a legitimate concern that either sort of individual can assert domination or control by means of direct campaign contributions under such circumstances. But that would also be true absent the challenged provision, in which case any individual, regardless of geography, could only contribute up to the $5,000 limit.

Now consider what happens when one of the waiver scenarios is triggered. As the law currently stands, depending on which waiver applies, in-state residents can then make direct campaign contributions either up to $500,000 or ***without limit***,[8] whereas out-of-state residents can contribute ***nothing***. Lastly, absent the challenged provision, and if a waiver provision kicks in, everyone would be permitted to make unlimited contributions directly to campaigns. In such a

---

[8] Recall that if the self-funding provision kicks in, then contributions from donors other than the donor or a member of the donor's family are capped at $500,000 per donor. 10 ILCS 5/9-8.5(b-5)(1.1). If the independent-expenditure-waiver provision kicks in, there is no limit on how much any single donor can contribute directly to the judicial candidate committee. The plaintiffs do not challenge these waiver-related provisions.

situation, there is equal opportunity for in- and out-of-state donors to "dominate and control" the judiciary via campaign contributions. The State offers no basis on which to distinguish the threat to judicial integrity arising from direct campaign contributions by out-of-state residents from that resulting from contributions from in-state persons, and the Court can fathom none. The State's argument can only be predicated on the fact that direct campaign contributions in general can raise eyebrows when it comes to judicial integrity. Importantly, it cannot be the case that the State can restrict the speech of out-of-state contributors because it deems them uniquely and inherently erosive of public confidence. *Buckley*, 424 U.S. at 48-49 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."). Of course, the State does place a $5,000 limit on in-state contributions before the waivers kick in. But that's not when it matters; it's only once those limits are lifted—when the gloves really come off—that any credible threat to the appearance of the judiciary's integrity can be said to exist.

The Court recognizes that the underinclusiveness inquiry is of a "limited nature" and such claims "occupy difficult theoretical terrain." *Illinois Liberty PAC*, 904 F.3d at 471, 473. It is not simply because the State should also institute similar bans on in-state campaign contributions to further its purpose that this provision falters constitutionally. It is rather what the asymmetry reveals about the State's actual concerns that is fatal. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."); *White*, 536 U.S. at 780 (holding that a restriction on judicial candidates' speech was "so woefully underinclusive as to render belief in [the government's supposed interest of protecting the integrity of the judiciary] a challenge to the credulous"). The State does not contend that the judiciary is

16

*particularly* susceptible to capture by outside influences **as compared to** internal ones. Nor does the State argue that the public's confidence is shaken more by massive external spending than by internal spending. The examples of past corruption in Illinois courts the State cites in its briefing, *e.g.*, Operation Greylord, don't do the State any favors in this regard; there is no indication that any of those corruption scandals had much, if anything, to do with influences from outside of Illinois as opposed to internal ones.

Consistent with this reasoning, the Ninth Circuit recently struck as unconstitutional an aggregate limit on the amount that a candidate could receive from all out-of-state residents in part because the state "fail[ed] to demonstrate that the risk of quid pro quo corruption turns on a donor's particular geography." *Thompson v. Hebdon*, 7 F.4th 811, 825 (9th Cir. 2021). And even if the context of judicial elections warrants a broader conception of corruption than *quid pro quo* corruption, the State has not persuasively argued that there is a meaningful difference between in- and out-of-state residents' abilities to corrupt, or create the appearance of corruption, in any sense of the term. As a result, Illinois' exclusive targeting of out-of-state contributions raises a serious red flag that it is actually animated by what prospective out-of-state contributors have to say—or the ideologies of the judges whom they may tend to support—rather than public confidence in its judiciary.[9] Whatever its intent, the ban on out-of-state contributions will likely be more effective in preserving the status quo of the state's judiciary than in enhancing its appearance of integrity. Accordingly, the Court concludes that plaintiff Chancey has shown "some likelihood" that he will prevail on the merits of his constitutional claim.

---

[9] It hardly needs saying that the government may not justify a restriction on certain viewpoints based on a contention—which, to be clear, the State does not make here—that public confidence in one of its institutions erodes when that viewpoint is more widely disseminated.

### B.      Count II: Illinois' Limit on Contributions to IECs in Judicial Races

Plaintiffs Fair Courts America and Restoration PAC challenge as unconstitutional the Election Code provision placing a $500,000 cap on contributions to IECs established to support or oppose a candidate in a judicial race from any single source during an election cycle. Since the limit imposes a burden on speech, the Court must again scrutinize the governmental interest the limit purports to serve and whether it is appropriately tailored toward serving that interest. The parties dispute which level of scrutiny should apply and whether the limit survives under both levels.

Courts have consistently held that the government cannot limit contributions to IECs based on an anticorruption interest. *See Barland*, 664 F.3d at 154-155 (collecting cases). Three premises account for this result. First, the Supreme Court has narrowly interpreted the anticorruption interest to mean the prevention of *quid pro quo* corruption only. *See Citizens United*, 558 U.S. at 359. Second, that specific type of corruption "is the *only* interest the Supreme Court has recognized as sufficient to justify campaign-finance restrictions." *Barland*, 664 F.3d at 153. Third, "[t]he separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which [the Court's] case law is concerned." *Ariz. Free Enterprise*, 564 U.S. at 751. "As such, after *Citizens United*, there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations." *Barland*, 664 F.3d at 154.

But the State again contends that its interest in protecting the integrity of the judiciary is sufficient to justify such IEC-fundraising limits in the special case of judicial elections. It argues that its interest in preserving the public's confidence in judicial integrity extends beyond its interest in preventing conventional *quid pro quo* corruption and justifies this provision. Further, the State supposes that the courts have not ruled this interest out when striking IEC contribution limits in

previous cases because those cases concerned other—non-judicial—types of elections. *See id*. This broader, judicial-election-specific interest, the State argues, is capable of justifying a cap on contributions to IECs that would, the State admits, fail scrutiny if applied in the context of a legislative or executive election. Specifically, the State argues that this is because such contributions "can create the perception of a judiciary subject to the whims of major donors." Def.'s Resp. at 14. Although the Court is unaware of any binding authority that directly addresses it, this very issue has been at the heart of multiple Justices' concurring and dissenting opinions in the Supreme Court's campaign-finance decisions. *See, e.g.*, *Williams-Yulee*, 575 U.S. at 458 (GINSBURG, J. concurring) ("[B]ecause the role of judges differs from the role of politicians, this Court's precedents applying the First Amendment to political elections [should] have little bearing on elections to judicial office." (cleaned up)); *see also White*, 536 U.S. at 792 (O'CONNOR, J. concurring) ("If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.").

This Court does not need to reach the question of whether this governmental interest in judicial integrity can *ever* be capable of justifying campaign-financing limits in judicial elections that the traditional *quid pro quo* interest cannot in other types of elections. This is because even if (1) the State's special interest during judicial elections is valid in this context, and (2) the less-demanding "closely drawn" standard is applied,[10] the $500,000 limit fails because it is not closely drawn to further the stated interest.

---

[10] The parties also dispute which level of scrutiny applies. As discussed *ante*, contribution limits are typically evaluated under the less-demanding "closely drawn" standard. On the other hand, "laws that burden *spending* for political speech—whether candidate spending *or* independent spending—get strict scrutiny and usually flunk." *Barland*, 664 F.3d at 153 (collecting cases). The Court is not aware of any binding precedent holding that limits on contributions to entities that engage in independent spending exclusively are subject to one standard or the other. *See, e.g.*, *id.* at 154 (declining to determine which level of review applies to limit on aggregate

The State cites the damage done to the public's confidence in the integrity of the judiciary as a result of "massive spending in judicial elections," Def.'s Resp. at 13-14, but does not explain how the IEC contribution limit actually mitigates that damage. Suppose a judge were to rule in favor of a litigant who had made a million-dollar independent expenditure (or other sort of contribution) in support of the judge when the judge was running for election. This, according to the State, poses an obvious threat to the appearance of judicial integrity and so the State has a compelling interest in preventing the erosion of confidence that would attend such a ruling, but the State tells us nothing about how the IEC contribution and expenditure limit minimizes that threat. To make the case that the IEC restrictions are closely drawn, the State must argue that the $500,000 IEC contribution limit does something—anything—to shore up public confidence in judicial integrity. But other than making some conclusory statements, the State offers nothing.

That is almost certainly because the IEC restrictions are entirely inadequate to the task. It is true enough that, to qualify as "closely drawn," the State "need not address all aspects of a problem in one fell swoop," *Williams-Yulee,* 575 U.S. at 449, but here the State's actions are so flawed that it is impossible to credit the effort as a genuine attempt to address the problem. Consider what the legislature allows in purporting to stave off the threat posed by "massive spending" in judicial elections. First, recall that the Code imposes no limit on the amount that an individual may spend on his or her own independent expenditures in support of or opposition to a candidate during a judicial race. That is, plaintiffs FCA and Restoration PAC's prospective donors—the ones who wish to contribute more than $500,000 to those IECs but are prevented from doing so by to the challenged provision—can spend that money on their own independent

---

annual PAC contribution limit because the government's anticorruption interest is insufficient to justify the restriction under either level of scrutiny); *SpeechNow.org v. FEC*, 599 F.3d 686, 695-96 (2010) (reaching a similar conclusion).

expenditures in connection with a judicial race. They could, for example, run their own ads or distribute their own pamphlets without involving a committee. Next, as discussed above, if an individual or IEC makes $100,000 in independent expenditures in support of or opposition to a particular judicial candidate, then the independent-expenditure waiver kicks in. Upon triggering of that independent-expenditure waiver, anyone (other than an IEC) can make unlimited contributions directly to a candidate's campaign committee in that race.

Illinois' current framework, then, does virtually nothing to mitigate the threat posed by large donations to IECs. Consider the hypothetical litigant who wants to donate a million dollars to support the candidacy of the judge presiding over his case; he would have myriad means to do so notwithstanding the IEC restriction. The contributor-litigant could, for example, donate up to the $500,000 limit to an IEC that makes independent expenditures in support of the judge and spend the other half on his own independent expenditures in support of the judge.[11] Alternatively, the contributor-litigant could spend the whole million dollars on individual independent expenditures without involving a committee. Most problematically, the contributor-litigant can spend only $100,000 in independent expenditures in support of the judge, thus triggering the independent-expenditure waiver, ***and then donate $900,000 directly to the judge's candidate committee***. This scenario actual increases the risk and appearance of corruption because, as the Supreme Court has recognized, *see Citizens United*, 558 U.S. at 359-60, direct contributions to

---

[11] It is not clear from the parties' briefing or the Election Code whether an individual may contribute up to $500,000 to multiple IECs that can then re-route those contributions to one IEC, or if an identical set of individuals can otherwise create "shell" IECs, to get around the $500,000 limit under the current regime. One can imagine that those involved in running Restoration PAC could theoretically circumvent the $500,000 limit on its prospective contribution to FCA by creating two new IECs and routing the money in excess of $500,000 through them. The possible availability of these alternatives would further weaken the State's argument, but the Court does not consider them now given the undeveloped state of the record and the expediency with which it must resolve the plaintiffs' motion for a preliminary injunction.

candidate campaign committees are categorically more likely to corrupt in this sense than independent expenditures.

In response to the availability of these alternative channels of injecting large sums of money into judicial races, the State argues that the $500,000 cap nevertheless furthers its interest because it enhances transparency by reducing the ability of donors to use IECs as independent channels to conceal their identities. Moreover, these donors would opt for using these independent channels over direct candidate committee contributions to avoid having the details of their contributions disclosed as part of the candidate committee's required disclosures. The State points out that "Plaintiffs allege that Restoration PAC would like to contribute in excess of $500,000 to [FCA], another PAC, which obscures the ultimate source of the donation and requires greater exploration on the part of voters who wish to be informed." Def.'s Resp. at 15. But this argument does not hold water. First, in the hypothetical situation above, the obfuscation of the source actually makes it less likely that the hypothetical easily-swayed judge will rule in favor of the donor. If, as the State argues, the provision obfuscates the source of the money going toward independent expenditures, the judge, too, would have to follow a paper trail to determine the identity of the donor. The State rejoins that donors might take it upon themselves to inform judges of their donations, but that is a possibility whether or not there are limits on IEC contributions and expenditures.

In sum, the State has not sufficiently explained how the $500,000 limit on IEC contributions accomplishes anything other than imposing some burden on plaintiffs' exercise of their speech and associational rights. Admittedly, given the myriad ways a well-heeled donor can work around the IEC restrictions, the burden is not great. But even if that burden is minimal, "something … outweighs nothing every time." *Barland*, 664 F.3d at 144 (quoting *SpeechNow.org*,

599 F.3d at 695). For this reason, the Court concludes that plaintiffs FCA and Restoration PAC have shown some likelihood of success on the merits.

## II.    Other Preliminary Injunction Factors

The plaintiffs have shown that they have no adequate remedy at law and will suffer irreparable harm if the Court does not enjoin the defendants from enforcing the challenged provisions in the upcoming November 8 election. They have also shown that the balance of harms tips in their favor.

### A.    Adequate Remedy at Law

The State does not dispute that the plaintiffs have no adequate remedy at law. Money damages are rarely adequate remedies for the loss of First Amendment freedoms. *See Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) ("In [First Amendment] cases the quantification of injury is difficult and damages are therefore not an adequate remedy."); *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages."). Therefore, the only adequate remedy in this case would be equitable—*i.e.,* injunctive—relief.

### B.    Irreparable Injury

The State disputes this element. It argues that the plaintiffs have failed to show "irreparable harm because they cannot show they have suffered any constitutional wrong." ECF No. 12, Def.'s Resp. at 18. But that is just to double-down on its argument on the merits, rather than to address the nature of the injuries claimed and so forfeits any argument that the plaintiffs' injuries are not irreparable even if caused by an unconstitutional infringement of the plaintiffs' First Amendment rights. The defendants lose little by that forfeiture, however, because as the plaintiffs point out, the Seventh Circuit has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the preliminary injunction

analysis. Pls.' Mot. at 14; ECF No. 5; *Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As discussed in detail above, the plaintiffs not only credibly allege violations of their First Amendment rights but have also shown that they have some likelihood of success on the merits of both counts.

The State also argues that Chancey has not shown irreparable harm because "Chancey's bare assertion that he seeks to donate money to certain judges is unsupported by any evidence. Moreover, Chancey has submitted no evidence that he has any history of participating in elections through contributions." Def.'s Resp. at 18. Chancey does not need to submit evidence that he has previously contributed to electoral campaigns; he only needed to credibly allege that he seeks to do so now and his speech is chilled by the Code's prohibition on out-of-state contributions to judicial candidate committees. The Court addressed this point in its discussion of standing above.

Lastly, the State argues that the plaintiffs' delay in challenging these provisions shows they are not actually likely to suffer irreparable harm. *See Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) ("A lengthy, unexplained delay in seeking relief calls into question 'how urgent the need for preliminary equitable relief really is.'" (quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011)). "However, delay is only one among several factors to be considered; [the case law does] not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) (concerning a trademark case).

The plaintiffs did not delay regarding Count II, the $500,000 IEC contribution limit in judicial races. That limit was enacted May 27, 2022. Plaintiffs filed their complaint on August 3,

2022. As the plaintiffs point out, that is little over two months. The Court does not consider that to be a meaningful delay.

Turning to Count I, the prohibition of out-of-state contributions to judicial candidate committees, that provision came into effect on November 15, 2021. It thus took Chancey eight-and-a-half months to bring this claim. That is not a dramatic delay, and Chancey has explained why this delay is reasonable. He argues that, at least in the realm of campaign finance, he is a relatively unsophisticated party (especially compared to political parties, committees, etc.) "who may not know in the fall or winter of 2021 that [he] intend[s] to donate to candidates in the 2022 election—many of those candidates [were] not even … candidates yet." Pls.' Reply at 9. Further, the provision "applies only to out-of-state donors, who have even less reason to keep abreast of what Illinois' legislature is up to." *Id*. Considering these justifications, the limited duration of the delay, and the fact that delay is only one factor among many in determining the existence of irreparable harm, the Court will not preclude Chancey from seeking preliminary relief for this reason. Accordingly, the plaintiffs have demonstrated irreparable injury if the provisions at issue remain enforceable in the upcoming election.

## C.    Balancing the Harms

At this stage, the Court considers "the irreparable harm the nonmoving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied," and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). This factor involves what has been called "the 'sliding scale' approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms needs to weight towards its side." *Id*. at 12.

This factor is relatively straightforward in most circumstances where, as here, the plaintiffs make a strong showing of their likelihood of success on the merits of their First Amendment challenges. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Further, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

The timing of the upcoming election, however, complicates the issue, according to the State. The general election is coming up on November 8, 2022, less than a month from when relief would issue. The State argues that, over the past year, the State Board of Elections has made numerous preparations for the upcoming election, including "promulgat[ing] guidance regarding the contribution limits applicable to state judicial elections…" Def.'s Resp. at 21. "The disruption of these settled plans and expectations would be substantial, sparking confusion among state officials as well as candidates." *Id*. In support, the State cites the *Purcell* line of cases, which stand for the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Committee v. Democratic Nat'l Committee*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*); *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U.S. 951 (2014)).

Plaintiffs rightly point out, however, that the *Purcell* cases concerned last-minute changes to election laws, not campaign financing regulations. *Purcell* concerned the Court of Appeals for the Ninth Circuit's issuance of an order enjoining a state from enforcing a measure "requiring voters to present proof of citizenship when they register to vote and to present identification when they vote on election day." *Purcell*, 549 U.S. at 2. Such orders, the Supreme Court reasoned, can "result in voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5.

26

The requested relief here does not implicate the same concerns. The *Purcell* principle cautions against creating confusion, disruption, and "unanticipated and unfair consequences for candidates, political parties, and voters, among others" arising from eleventh-hour changes to election procedures. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (KAVANAUGH, J. concurring). Here, there is little basis for such worries; it is difficult to imagine—and the defendants fail to persuasively raise the specter—that if relief is granted, then voters will be confused about whether, how, where, when, or for whom they can vote. Although candidates and committees have settled expectations about their finances, they are doubtless all interested in obtaining additional financing; there is no reason to suspect that any one party, candidate, or committee will be particularly prejudiced if relief is granted. Lastly, to the extent the State argues that it is itself prejudiced by having to issue new guidance at the late hour, that does not outweigh the First Amendment harms suffered by the plaintiffs and those who are similarly situated to them. And to the extent the State claims any prejudice, the problem is in large measure self-inflicted; the State, not the plaintiffs, enacted these amendments, which raise substantial constitutional concerns, less than a year before the election. Hyperbole aside, the State fails to explain why "chaos" will reign if it is enjoined from enforcing two campaign finance provisions that were enacted only months before this suit was filed.

For these reasons, the Court finds that the balance of harms also tips in favor of the plaintiffs.

*    *    *

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is granted. Since the plaintiffs have demonstrated some likelihood of success on the merits of their claims, they have also demonstrated that they have plausible claims for relief and defendant Attorney

General Raoul's motion to dismiss is therefore denied. Accordingly, it is hereby ordered that Illinois is, pending further order of this Court, enjoined from enforcing subsections 10 ILCS 5/9-8.5(b-5)(1)(B) and 10 ILCS 5/9-8.5(b-5)(1.2).


Dated: October 14, 2022

John J. Tharp, Jr.
United States District Judge